UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET MCCUE,<br><br>        Plaintiff,<br>v.<br><br>MASSACHUSETTS INSTITUTE OF<br>TECHNOLOGY and KWANGHUN CHUNG,<br><br>        Defendants. | JURY TRIAL DEMANDED |

## INTRODUCTION

1. Plaintiff Margaret McCue—a fifth-year Ph.D. candidate in the Brain and Cognitive Sciences program at Defendant Massachusetts Institute of Technology (MIT)—was subjected to gender and disability discrimination and a hostile educational environment at MIT. MIT Professor Defendant Kwanghun Chung discriminated against the Plaintiff while she was a member of his laboratory, ultimately removing her from his laboratory and giving credit for her work to male scientists. When she complained about his actions, he retaliated against her, actively blocking her attempts to pursue her work in another lab. Following Plaintiff's complaints about these issues, Defendant MIT, by and through its administrators, failed to support her, and retaliated against her by preventing her from completing her Ph.D. requirements, and instituting a baseless research misconduct inquiry against her. She has initiated the instant action to seek redress for the harm caused by Defendant MIT's violations of Title IX of the Education Amendments Act of 1972 ("Title IX"), the Rehabilitation Act, and the Americans with Disabilities Act ("ADA") as well as its related obligations under state contract and tort law.

1

2. Ms. McCue worked diligently from the time she entered the Brain and Cognitive Sciences ("BCS") Ph.D. program, earning a 4.9 GPA, was invited into the Neurobiological Engineering Training Program, won a graduate teaching award, and was invited to present her work at various conferences usually reserved for more senior students. Ms. McCue was on track to obtain her Ph.D. until she was abruptly removed from Dr. Kwanghun Chung's laboratory after two years in the laboratory, after inventing an innovative technique for tissue clearance that was to form the basis of a publication for which she was supposed to be first author. When she was in his laboratory, Dr. Chung treated Ms. McCue differently than her male peers—assigning her to do lab housekeeping tasks, making sexist comments that she should not obtain a Ph.D. because her husband could support her and instead should have babies, and denigrating her work and her thinking while praising male students whose work was comparable to hers.

3. In addition to his sexist comments and discrimination against Ms. McCue based on her gender, Dr. Chung also discriminated against her once she revealed to him she suffered from depression. As he had with prior students with mental health issues, Dr. Chung told Ms. McCue she could not handle the stress of the Ph.D. program, and told her if he had known she had depression he would have removed her from his laboratory earlier. When she disclosed her disability he told her he would fail her every term if she stayed in his lab.

4. Dr. Chung abruptly removed Ms. McCue from his lab in the fall of 2017, and subsequently replaced her as first author on the paper describing the technique she invented with three male students. He promised to provide her financial support and continue as her co-advisor after she left his laboratory; he then reneged on those promises after she complained about his discriminatory treatment.

5.  Ms. McCue reported Dr. Chung's discriminatory treatment of her to Dr. Matthew Wilson, then the graduate student representative for the BCS Department, starting in September 2017. Dr. Wilson took no steps to address the discrimination Ms. McCue faced. Ms. McCue continued to raise concerns about discriminatory treatment to MIT administrators throughout 2018. MIT and Dr. Chung retaliated against Ms. McCue for raising these concerns. MIT engaged in a sham assessment of Ms. McCue's contributions and approved Dr. Chung's discriminatory decision to remove Ms. McCue as first author on the publication describing the technique she invented. MIT acquiesced in Dr. Chung's decision to make false allegations of research misconduct against Ms. McCue and avoided applying its research misconduct policies to those allegations, leaving Ms. McCue ignorant of his accusations even as he dissuaded other faculty from working with her, and depriving Ms. McCue of any process by which to prove her innocence.

6.  Ms. McCue filed a formal complaint against Dr. Chung with MIT in January 2019, alleging discrimination on the basis of gender and disability. Faced with Ms. McCue's formal complaint, MIT engaged two investigators who refused to consider relevant evidence Ms. McCue tried to present and failed to address specific allegations of discriminatory behavior Ms. McCue raised. The investigation lasted well over a year, and in April 2020, after failing to consider evidence or address the factual underpinnings of Ms. McCue's claims, MIT's investigators found that Dr. Chung had not discriminated against Ms. McCue. That decision is currently on appeal and MIT has failed to follow its rules and procedures for addressing that appeal in a timely manner.

7.  Defendant MIT's actions constitute discrimination and retaliation in violation of Ms. McCue's civil rights and violate MIT's own policies and practices. MIT's arbitrary and

capricious decisions have prevented Ms. McCue from obtaining her Ph.D. despite the fact that at the time she was removed from the laboratory she met all requirements for the Ph.D. up to that point, and had invented a novel technique that was subsequently published in an article in *Nature Biotechnology* and has been featured on the National Institute for Health's blog.

8.  Defendants' discriminatory and retaliatory treatment of Ms. McCue eliminated her ability to obtain her Ph.D. and advance her career in the sciences.  She has suffered substantial damages as a direct and proximate result of MIT's actions, including reputational harm, emotional distress, lost career opportunities, lost earnings potential, and other consequential damages.

## JURISDICTION AND VENUE

9.  This action arises out of MIT's violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681), the Rehabilitation Act, and the ADA, as well as its breach of contract and violation of state tort laws.

10.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1367.

11.  Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

12.  Plaintiff Margaret McCue resides in San Diego, California. She was until on or about August 1, 2020, a Ph.D. candidate in the Brain and Cognitive Sciences ("BCS") Department at the Massachusetts Institute for Technology ("MIT").

13.  Defendant Massachusetts Institute of Technology ("MIT") is a federally-funded private university in Cambridge, Massachusetts, with a total student body of approximately 11,520 students.

14. Defendant Kwanghun Chung ("Chung") is a professor at MIT, and was until May 2018 Plaintiff's Ph.D. advisor.

## FACTS

### Plaintiff's Academic History at MIT

15. Plaintiff enrolled as a Ph.D. student at MIT in August 2014.

16. Plaintiff is a 2011 graduate of Dartmouth College, with a B.A. in neuroscience and an impressive history of work in research at a wide variety of scientific institutions.

17. Between November 2014 and April 2015, Plaintiff completed her three required laboratory rotations, including a rotation in Chung's lab.

18. By December 2016, Plaintiff had completed all of the basic coursework and teaching assistant responsibilities required for her PhD in Brain and Cognitive Sciences.

19. Between 2014 and 2017, Plaintiff received several academic honors at MIT.

20. As a graduate student at MIT, Plaintiff was accepted into the MIT Neurobiological Engineering Training Program, a program that selects "high quality students" from MIT graduate programs, and provides them additional training, coursework, and funding with students obtaining a Certificate in Neurobiological Engineering upon completion of their degrees.

21. Plaintiff was a Teaching Assistant for three courses and received the Walle Nauta Award for Excellence in Graduate Teaching for her work.

22. Plaintiff was invited to present her research in front of the BCS department at two separate events (Picower Plastic Lunch and the Picower Annual Retreat), both of which are typically conducted by post-doctoral researchers or students who have made significantly above average progress in their research.

23. On multiple occasions, Plaintiff was asked to present her work at the Society for Neuroscience (SFN) conference.

24. Plaintiff maintained a 4.9 GPA at MIT across a wide variety of courses in areas including molecular and cellular neuroscience, cognition, biomaterials, and computational neuroscience.

25. Plaintiff joined Chung's laboratory as a graduate student researcher in April 2015.

### Dr. Chung's Hostile and Biased Behavior Toward Plaintiff

26. Dr. Chung was an extremely harsh and demanding leader of the lab, who expected lab members to work long hours, punished and criticized members who had to take leave, verbally abused subordinates in the lab, and engaged in exercises of favoritism when assigning projects or authorship.

27. Dr. Chung specifically targeted female lab members with these behaviors.

28. When Plaintiff joined the Chung lab as the only female graduate student or post-doctoral researcher in the lab, Dr. Chung expected her to take on extra work that was not required of the male lab members, such as organizing social events for the lab and organizing birthday cards for male lab members.

29. Dr. Chung would ask only male students to take on tasks related to computers and programming, and discouraged Plaintiff from undertaking that work, even when Plaintiff had far more relevant experience.

30. In 2015, when he learned that her husband had a good job, Dr. Chung asked Plaintiff why she was in graduate school, implying that she should not pursue a career because her husband could support her.

31. In April 2017 Dr. Chung discouraged Plaintiff from applying for a scholarship, telling her that it was political and one of his students was unlikely to receive it. He then failed to submit her fellowship application or faculty letter of support. Meanwhile he encouraged and assisted a male graduate student to apply for the same scholarship without her knowledge.

32. Dr. Chung consistently undervalued Plaintiff's intelligence and abilities, denigrating her scientific ability and commitment to her face and to male lab members behind her back, while publicly praising male students for achievements that were the same as or similar to hers.

33. Dr. Chung's demanding and insulting behavior put Plaintiff under significant stress. In the summer of 2017, Plaintiff began to work primarily from home as a result of Dr. Chung's behavior to her.

34. In July or August 2017, Plaintiff disclosed to Dr. Chung that she was experiencing depression; she felt she had no choice but to disclose because she anticipated that she might ultimately need to take a medical leave.

35. Following Plaintiff's disclosure of her depression, Dr. Chung began to treat her in an increasingly critical way. In a meeting on August 16, 2017, Dr. Chung told her that she hadn't contributed anything to the lab since June. She explained that this was false, and pointed to all of the data she had collected and drafts she had written, all on a shared server. Dr. Chung ignored her and refused to look at the shared server. He also began accusing her of "disrespect" and telling her she was "grumpy" if she disagreed with him.

36. In late August or early September of 2017, Plaintiff had the flu and did have to take time off work, at her doctor's recommendation. When she returned to work following the leave, Dr. Chung told her she did not look sick, questioned whether she actually had been ill, and

expressed disappointment that she had not accomplished more work while out sick, telling her that if she couldn't work harder there would be repercussions.

### Plaintiff's Scientific Success While Working in the Chung Lab

37. Plaintiff developed an innovative technique for research while working in the Chung Lab, a technique for tissue clearance known as Stability to Harsh conditions via Intramolecular Epoxide Linkages preventing Denaturation, or SHIELD. The SHIELD project essentially makes tissue transparent so that it can be analyzed in order to provide neuroscientists with information about the structure of labeled proteins. Dr. Chung had pioneered a new tissue-clearing technique while a post-doctoral researcher at Stanford. Plaintiff's project built on his work, and that of others, to identify new fixatives that were able to preserve tissue much better, facilitating learning about the brain.

38. Plaintiff developed this new technique and worked on it as her primary project within the Chung lab for over 2 years. Three male post-doctoral researchers eventually joined the project, well after Plaintiff started and well after it was clear that the work was publishable.

### Dr. Chung's Discriminatory Decision to Remove Plaintiff from His Laboratory

39. On or about September 20, 2017, Dr. Chung and two of the three male post-doctoral researchers that Dr. Chung would ultimately give first-author credit for the SHIELD project met with Dr. Matthew Wilson, then the Graduate Student Representative of BCS, and expressed concern about the integrity of Plaintiff's data. Dr. Wilson ignored MIT's requirement that such concerns be reported to the Office of the Vice President for Research ("VPR")—a requirement intended to ensure that any such concerns were dealt with fairly. He suggested instead—without any investigation as to whether Dr. Chung's concerns were

substantiated—giving Plaintiff a non-passing grade so that the department could give her a warning and assign her to a different lab.

40. Around the same time, Plaintiff met with Dr. Wilson and raised concerns about a toxic and unfair environment in the Chung lab, detailing instances of Dr. Chung's harassment of lab members and his determination of authorship credit and project assignments based upon favoritism. Dr. Wilson later acknowledged that in this meeting Plaintiff told him that she felt that she was not being treated fairly or with respect because she was a woman. Dr. Wilson did not tell Plaintiff that Dr. Chung had raised alleged concerns about her data.

41. On September 28, 2017, Plaintiff and Dr. Chung met and he asked her if she had made progress finding a new lab, which surprised her because the SHIELD paper was not yet submitted and they had previously agreed that despite their conflicts she would remain part of the Chung lab at least through the completion and submission of the paper. Dr. Chung told her that he was no longer willing to mentor her through submission of the paper. He suggested that she graduate with a master's degree, take some time off, and have babies, telling her that he found having a baby relaxing and he thought she needed to relax after being stressed in his lab. When Plaintiff pushed back, saying that she did not want to resign from the lab while her project was still in progress and not yet published, he told her that he would fail her for the summer and for every semester after if she did not leave the lab. He told her that it would be "very painful" for her if she stayed. He offered her financial support if she moved to another lab, promised to continue co-advising her, and promised to give her credit for her thesis project, the SHIELD paper, when it was published.

42. At some point during this meeting Plaintiff asked Dr. Chung what he would do if she told him she was suffering from depression. He responded that he would have forced her to leave his lab earlier.

43. Dr. Chung also told Plaintiff a story about how he had to convince a former graduate student to leave the lab because the student just wasn't meant for a PhD program because he had issues with depression and Dr. Chung thought he should go to medical school. Plaintiff mentioned that rather than going to medical school this student had become a science technician in another lab, and Dr. Chung snapped at her that she was insulting him and that these comments were part of the reason he had to kick her out of the lab.

44. During that meeting, Dr. Chung, for the first time, questioned Plaintiff about certain data sets from the SHIELD project. Plaintiff explained the data, and offered to show him the raw data files and the metadata of the imaging conditions, which would confirm that she had not fabricated any data and that she had taken all of the images under identical conditions, confirming that the images were not falsified. Dr. Chung also had independent access to all of these materials. Dr. Chung said he did not want to see the data and continued to insist he didn't understand the data and it did not matter what Plaintiff had to say because of the other issues they had already discussed earlier in the meeting (i.e. depression).

45. Following that meeting, Plaintiff took medical leave for the Fall 2018 term due to stress and depression caused by her experience with Dr. Chung. Her understanding based on Dr. Chung's representations was that while he was requiring her to leave his lab, he would remain her advisor, would financially support her continued work and provide her necessary equipment for her research, and that she would still be the first author on the SHIELD paper.

**MIT's Failure to Prevent Further Interruption to Plaintiff's Educational Progress**

46. Plaintiff returned from medical leave for the Spring 2018 semester. She arranged to work with Dr. Kerry Ressler at Harvard and in early February she emailed Dr. Chung, telling him her plan. Dr. Chung's responses to that email made it clear that, contrary to his assurances when telling her to leave his lab, he did not intend to fund her work in any way.

47. Plaintiff attempted to resolve the question of funding amicably, reaching out to Dean Suraiya Baluch and the MIT ombudsperson. In late March, Plaintiff met with Dr. Wilson and explained that she believed that Dr. Chung had discriminated against her on the basis of her gender. He suggested trying to resolve the issues with Dr. Chung, and discouraged her from sharing any concerns with the department head.

48. In a March 28, 2018 meeting between Plaintiff, Dr. Chung, and Dr. Wilson, and Dean Baluch, Plaintiff again raised concerns about discrimination and retaliation by Dr. Chung. Dr. Chung responded with rage, and stated he would no longer serve as her co-advisor, as he had previously agreed to do.

49. In several additional meetings, Plaintiff sought MIT's support in her attempts to secure the funding and support she had been promised when Dr. Chung required her to leave his lab. The more she pressed for that support the more adamant Dr. Chung became that he would not support her.

50. MIT consistently refused to require Dr. Chung to provide the resources that he had promised. These resources included access to equipment and chemicals necessary for Plaintiff to continue her research, and which Plaintiff had relied upon having access to when making her plans with Dr. Ressler. Beginning in the Spring of 2018 and continuing throughout Plaintiff's time at MIT, Dr. Chung refused to provide Plaintiff with these

resources and actively interfered with her ability to access resources outside of his lab at MIT.

51.   In a meeting on May 11, 2018, Dr. Chung called Plaintiff a liar, accused her of making misrepresentations, told her she was disrespectful, and ordered her not to have any further contact with his lab.

52.   When instructing other faculty to deny Plaintiff access to equipment and materials, Dr. Chung falsely told them that she had committed research misconduct.

53.   Plaintiff met with Dr. Wilson in May 2018 to discuss Dr. Chung's refusal to fulfill his promises to support her. Dr. Wilson expressed his view that Dr. Chung was being "reasonable," and that it was best for Plaintiff and Dr. Chung to "cut ties." Plaintiff asked if she could bring her concerns about the situation to Dr. DiCarlo, and Dr. Wilson told her that she should not until she had an approved timeline for completing her PhD, strongly implying that it would be risky to her status as an MIT graduate student to escalate her concerns about discrimination.

### Dr. Chung's Publication of Plaintiff's Work Replacing Her with Male Scientists as First Author, and MIT's Refusal to Intervene

54.   The SHIELD project was submitted on March 28, 2018 to *Nature Biotechnology* and was published on December 17, 2018. Dr. Chung gave three male lab members who worked on the project first author status on the published paper, demoting Plaintiff to second author, despite Plaintiff's far more significant intellectual contributions to the development of the technique and the far greater time she devoted to the work. While Plaintiff was the initiator of the project and had worked on it for over two years, one of the male post-doctoral researchers who was given first authorship could only have worked on the project for a maximum of 5 months before the paper was submitted for publication.

55. When Plaintiff raised her concerns about the authorship of the SHIELD paper in a meeting with Dr. Chung, Dr. Wilson, and Dr. Baluch on or about April 6, 2018, it was agreed that Plaintiff and Dr. Chung would mediate the dispute through the MIT ombudsperson. The ombudsperson repeatedly reached out to Dr. Chung to schedule a mediation, but Dr. Chung refused to respond. Plaintiff brought his refusal to participate to Dr. Wilson's attention but Dr. Chung never responded and no mediation took place.

56. On or about October 10, 2018, Plaintiff challenged the authorship determination as to the SHIELD paper through MIT's formal authorship review process. MIT upheld Dr. Chung's decision on October 26, 2018. The two professors assigned to resolve the dispute, Dr. Paula Hammond and Dr. Elazer Edelman, conducted an investigation limited to interviews with Plaintiff, Dr. Chung, and the male post-doctoral researchers who received first author credit for the paper. The investigators explicitly stated that they believe that professors should have control of assigning authorship. They refused to consider the fact that Dr. Chung had similarly deprived another female student of credit for her work, although Plaintiff shared that information with them. The investigators refused to accept evidence from Plaintiff, including the data she had generated for the article. They did not apply *Nature Biotechnology*'s criteria for determining appropriate credit, and despite Plaintiff's repeated requests, they did not articulate what criteria they used to determine what contributions should result in first-author status.

**Plaintiff's Internal Discrimination Complaint to MIT**

57. Plaintiff reported to numerous officials at MIT regarding Dr. Chung's harassing behavior, his refusal to provide her with support and active undermining of her research, and told these officials that she believed that his behavior to her was motivated by gender and

disability discrimination, beginning with her conversation with Dr. Wilson in or around September 2017. These included Dr. Wilson; Steve Salk, the human resources representative for Brain and Cognitive Science, who told her that he could not help her because she was a graduate student and MIT did not consider her to be an employee; Dr. Jim DiCarlo, the BCS department head; Pia Handsom, the BCS Administrator; Sierra Vallin, the BCS Academic Administrator; Catherine Kim, Assistant Dean for HR and administration, and Raquel Irons, human resources officer; and Sarah Rankin, MIT's Title IX Coordinator.

58. Although Plaintiff consistently raised concerns about gender and disability discrimination in her meetings with MIT administrators starting in fall 2017, and continuing after her return from medical leave for the spring 2018 semester, it was not until October 2018 that Ms. Kim and Ms. Irons finally provided her with guidance on how to formally file a complaint against Dr. Chung.

59. On January 21, 2019, Plaintiff filed a formal complaint against Dr. Chung with Human Resources, alleging that during her time in his lab, and after he forced her to leave the lab, he violated numerous MIT policies, including those against discrimination.

60. MIT assigned Jamie Sinetar and Professor Leslie Kolodziejski to investigate Plaintiff's complaint. Their investigation lasted well over a year and concluded with a final investigation report issued on April 21, 2020. That report did not find Dr. Chung responsible for discrimination or any violation of MIT's policies.

61. The investigators announced in the final report that they would not investigate the dispute over the authorship of the SHIELD paper, or Plaintiff's claim that Dr. Chung had retaliated against her by making false allegations of research misconduct against her to VPR (something she learned he had done only from the investigators), even though those issues

were central to her complaints. Instead, they focused on issues regarding the atmosphere in the lab. Even as to those issues, their conclusions disregarded substantial evidence of a pattern of hostile treatment of female lab members. As to Plaintiff's departure from the lab, they took Dr. Chung's claim that he believed she had engaged in research misconduct fully at face value with no investigation or consideration of the extensive evidence that this concern was pretextual.

62. Plaintiff submitted an appeal from the investigators' decision regarding her discrimination claims to Human Resources on June 4, 2020, and is still awaiting a decision on that appeal.

**Defendants' Retaliation Against Plaintiff**

**Interference with Plaintiff's Ability to Complete her Work**

63. On or about June 1, 2018, shortly after Plaintiff had raised questions of gender bias in assignment of authorship in the SHIELD paper during meetings with Dr. Wilson and other administrators, BCS issued her a departmental warning telling her that she was not in good standing with the department because she lacked a full-time faculty research advisor.

64. During the course of discussions between Plaintiff, Dr. Chung, and various administrators and professors in the BCS department in 2018, MIT offered to assist Plaintiff with the cost of microscopic imaging that was necessary to her research.

65. During discussions in 2018 Dr. Chung agreed with BCS that he would provide Plaintiff with materials like chemicals necessary for SHIELD research and access to lab space. He ultimately reversed all of those commitments and refused to provide Plaintiff even with chemicals as to which he was the only possible source.

66. On or about January 16, 2019, Dr. Rebecca Saxe informed Plaintiff on behalf of BCS that BCS would fully fund her stipend and tuition at MIT until (but not beyond) August 2019. At

this point, MIT placed the burden on Dr. Ressler to fund Plaintiff's research expenses, including those, such as microscopic imagining, that it had previously agreed to fund or that Dr. Chung had agreed to provide.

**Defendants' Institution and Prosecution of Baseless Research Misconduct Case Against Plaintiff**

67. At some point in October 2018, Dr. Chung contacted VPR falsely accusing Plaintiff of research misconduct. At that point, he did not provide any supporting information or documentation and VPR did not commence any inquiry into his allegation.

68. On February 8, 2019, the month after Plaintiff made a formal complaint of gender and disability discrimination against him, Dr. Chung went to VPR and shared documentation of Plaintiff's supposed misconduct.

69. Because Plaintiff's complaint of discrimination was pending with Human Resources, VPR held the complaint of research misconduct in abeyance and did not notify Plaintiff of it or commence any form of inquiry into its truth.

70. Dr. Chung falsely told colleagues that Plaintiff had engaged in research misconduct. On or about July 20, 2018, Plaintiff reached out to Dr. Li-Huei Tsai, explaining that while she was still a BCS graduate student, she was now working with Dr. Ressler's lab. She asked for permission to use the confocal microscope located in the Picower Institute for Learning and Memory at MIT. Dr. Tsai agreed to grant her that access on July 21, 2018. When Dr. Chung learned that Plaintiff had reached out to Dr. Tsai, he contacted Dr. Tsai, falsely told her Plaintiff had engaged in research misconduct, and told her he had concerns about Plaintiff having access to the microscope. Then on July 23, 2018, Dr. Tsai wrote to say that she had spoken to "several colleagues" and that they agreed that Plaintiff could not use the

microscope. On information and belief, this was because Dr. Chung, a close colleague of Dr. Tsai, had told her that she should deny Plaintiff access.

71. Upon information and belief, Dr. Chung also falsely told Dr. Gloria Choi that Plaintiff engaged in research misconduct, causing Dr. Choi to abruptly leave Plaintiff's thesis advisory committee in July 2018. Dr. Chung and Dr. Choi are close colleagues who frequently collaborate. When Plaintiff asked Dr. Choi why she would no longer serve on her committee, Dr. Choi would not give a reason, instead saying only "I think it will still serve you better if you can find another committee member." Plaintiff had to get special permission to convene a thesis advisory committee without a BCS professor in her specialty; on information and belief, this was because of negative rumors that Dr. Chung spread about her.

72. On May 4, 2020, immediately after the final report was issued in Plaintiff's discrimination complaint to Human Resources, and before Plaintiff's appeal from its conclusion was due, VPR informed Plaintiff that it was opening an initial inquiry into Dr. Chung's allegations against her, which had been reported to VPR more than 18 months prior. Plaintiff has appealed from the investigators' decision regarding her discrimination claims and is still awaiting a decision on her appeal, submitted in early June 2020. As of this writing, VPR has not yet assigned a Fact Finder to start the inquiry.

**Dr. Chung's History of Discrimination Against His Female Students and Students with Mental Health Disabilities**

73. Upon information and belief, for many years Dr. Chung engaged in discrimination against female members of his lab, and against members of the lab who had mental disabilities or that he regarded as having such disabilities.

74. Turnover among students and employees was very high during Plaintiff's time in the Chung Lab, and departure rates for female lab members in every lab position were much higher than for male lab members.

75. During Plaintiff's time in the Chung lab as a graduate student there were no other female graduate students and no female post-doctoral researchers.

76. Although Dr. Chung's lab has existed at MIT for 7 years and 9 papers were published by the Chung lab, none were led by a female author. Of his few collaboration projects with a female lead author, the female students in each case were in different labs at MIT and were not mentored by Dr. Chung.

77. Dr. Chung deprived the only other female graduate student ever to work in the Chung lab of credit for her scientific work, and instead assigned the credit to male lab members. When a project that she worked on for months began to produce strong results, Dr. Chung instructed her to transfer her protocol to a male post-doctoral researcher with less relevant experience and demoted her to second author on the project. Gender discrimination and verbal abuse by Dr. Chung and the male post-doctoral researcher ultimately led her to quit her PhD. By the time the project was officially published, the female graduate student had been demoted to sixth author on the paper.

78. Other female employees, including two female lab managers, also experienced Dr. Chung's mistreatment and left the lab as a result.

79. Dr. Chung had a history of mistreating lab employees who were experiencing mental health difficulties.

80. Dr. Chung regularly harassed one member of his lab who experienced depression, accusing him of not being "motivated enough" and telling him to drink caffeine to combat his

depression. When this member left the lab, Dr. Chung told Plaintiff that he had to leave because he had major depression and Dr. Chung therefore suggested that he should "choose a different career path that would better suit him."

81. Dr. Chung similarly told the only female graduate student in his lab prior to Plaintiff that being yelled at was a good mental exercise for her to become a stronger person as she was "mentally weak."

82. Dr. Chung told Plaintiff that another former graduate student was mentally unstable and therefore not fit for graduate school.

83. Plaintiff heard Dr. Chung express his view that mental illness was a barrier to success in graduate school, repeatedly stating that some people (referring to those with mental health diagnoses) just aren't suited for PhD programs because the programs are very stressful.

## Plaintiff's Departure from MIT Without a Degree

84. On or around September 2019, Plaintiff began a second medical leave, due to the stress of participating in MIT's internal investigation of her discrimination complaint. While she continued to work on her research during that time, she did not work the full 60-hour-a-week schedule typical of MIT graduate students.

85. Plaintiff returned from her leave for the spring 2020 semester. At the point of her return, Plaintiff had completed extensive work toward her dissertation, including the bulk of the necessary scientific work, but still had to analyze data and image many of her samples.

86. On January 10, 2020, Dr. Saxe emailed Plaintiff and Dr. Ressler, setting forth a schedule for Plaintiff to complete her PhD by summer 2020. Her email proposed, and Dr. Ressler agreed, that Dr. Ressler would pay Plaintiff's stipend and residual tuition for the semester, as well as acting as Plaintiff's advisor and providing her space and resources in his lab. BCS did not

commit to covering any of Plaintiff's costs and Dr. Saxe specified that "there is no potential source of funding for you after summer 2020 from BCS or from Dr. Ressler." Dr. Saxe noted that if Plaintiff were unable to complete her PhD by the end of summer 2020, she could submit a Master's degree thesis, and wrote, "we believe you would be able to do so based on your prior or existing work, at any time."

87. When she returned from leave and had more detailed conversations with Dr. Ressler, Plaintiff learned that Dr. Ressler could no longer bear the costs of the imaging necessary for her project—costs that were necessary only because MIT and Dr. Chung had barred her from using MIT resources such as the Picower microscope. Plaintiff also discovered that much of the imaging that she had already completed and stored on Harvard servers had been accidentally deleted during her medical leave.

88. On February 25, 2020, Dr. Ressler notified Dr. Saxe that Plaintiff would not be able to complete her PhD and would be seeking to graduate with a Master's degree, and asked that Dr. Saxe send him and Plaintiff the materials/guidelines needed for that process. Dr. Saxe responded that if Plaintiff were first author on a peer reviewed paper, that would suffice as a Master's thesis, but that otherwise there was not guidance about what would qualify for such a thesis.

89. On March 1, 2020, Plaintiff received notice that she had been withdrawn from MIT.

90. Because of the repeated delays and interruptions to her work that resulted from Dr. Chung's mistreatment and discrimination, and lacking resources to commence a new project, Plaintiff was unable to produce finished work that she believed would qualify as a Master's thesis and has not received any degree from MIT.

## COUNT I
### Violation of Title IX – Gender Discrimination
*(Against Defendant MIT)*

91. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

92. Defendant MIT is a recipient of federal funding and is thus subject to Title IX of the
    Education Amendments of 1972.

93. Pursuant to Title IX, Defendant MIT is prohibited from discriminating against its students
    on the basis of their sex.

94. As a graduate student at MIT, Plaintiff was a full-time student in the Ph.D. program in Brain
    and Cognitive Sciences program and also received an annual stipend to be a research
    assistant.

95. Plaintiff has been subjected to discrimination on the basis of her sex at MIT.

96. Plaintiff is a qualified student who has completed all of the coursework for her Ph.D. with a
    4.9 GPA, and who had completed nearly all of the experimental work for her Ph.D. at the
    time she was removed from Dr. Chung's laboratory.

97. Plaintiff has suffered adverse actions that have impaired her educational opportunities at
    MIT, including but not limited to Defendant MIT's approval of Dr. Chung's unwarranted
    decisions to remove her from his laboratory and subsequently interfere with her access to
    necessary resources, which prevented her completing her Ph.D.

98. Defendant MIT, by and through Dr. Chung's discriminatory actions, took these adverse
    actions against Plaintiff because of her sex.

99. Defendant MIT was on notice of Plaintiff's complaint of discrimination as early as October
    2017, yet has failed to effectively remedy the discrimination in deliberate indifference to
    Plaintiff's rights.

100. These actions constitute gender discrimination against Plaintiff in violation of Title IX of the Education Amendments Act of 1972.

101. Plaintiff has suffered damages as a result of Defendant MIT's actions, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT II
## Violation of Title IX – Retaliation
*(Against Defendant MIT)*

102. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

103. Pursuant to Title IX, MIT is prohibited from retaliating against a student who makes a complaint of sex discrimination at MIT.

104. Plaintiff engaged in protected activity by complaining to administrators in the Brain and Cognitive Sciences Department and to employees in the Human Resources Department that Dr. Chung's actions constituted gender discrimination, and then on January 21, 2019 by filing a complaint of discrimination with Defendant MIT.

105. Following Plaintiff's complaints, Defendant MIT, by and through its employees, including Drs. Wilson and Chung, engaged in a concerted effort to retaliate against Plaintiff by removing her from the Chung laboratory, Dr. Chung refusing to serve as her co-advisor, Dr. Chung withdrawing promised financial support for the completion of her Ph.D., Dr. Chung spreading baseless allegations of research misconduct against Plaintiff to faculty members at MIT, and Drs. Wilson and Chung working together to circumvent MIT's policies for addressing concerns of research misconduct and depriving Plaintiff of the ability to know about those allegations and respond to them.

106. Defendant MIT, by and through its administrators and agents, has instituted a baseless research misconduct inquiry into Plaintiff.

107. Defendant MIT's motives for these actions was to retaliate against Plaintiff because she made internal complaints of discrimination against MIT.

108. These adverse actions taken by Defendant MIT constitute retaliation against Plaintiff in violation of Title IX of the Education Amendments Act of 1972.

109. Plaintiff has suffered damages as a result of Defendant MIT's actions, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT III
### Discrimination in Violation of the Rehabilitation Act
*(Against Defendant MIT)*

110. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

111. Defendant MIT receives federal funding and is thus subject to Section 504 of the Rehabilitation Act.

112. Plaintiff is an individual with a disability.

113. Plaintiff was otherwise qualified for the BCS Ph.D. program at MIT.

114. MIT discriminated against Plaintiff, by and through its employees, by removing her from the Chung laboratory because of her disability, depriving her of credit for her work, and depriving her of equipment and resources she needed to complete her Ph.D. research.

115. Plaintiff has suffered damages as a result of Defendant's MIT's actions, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

**COUNT IV**
**Discrimination in Violation of the Americans with Disabilities Act**
(*Against Defendants MIT and Chung*)

116. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

117. Defendant MIT is a place of public accommodation under Title III of the Americans with
     Disabilities Act.

118. Plaintiff is an individual with a disability.

119. Plaintiff was otherwise qualified for the BCS Ph.D. program at MIT.

120. Defendants discriminated against Plaintiff because of her disability by removing her from
     the Chung laboratory because of her disability, depriving her of credit for her work, and
     depriving her of equipment and resources she needed to complete her Ph.D. research.

121. Plaintiff has suffered damages as a result of Defendants' actions, including loss of the
     opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and
     reputational harm.

**COUNT V**
**Retaliation in Violation of the Rehabilitation Act**
(*Against Defendant MIT*)

122. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

123. Defendant MIT receives federal funding and is thus subject to Section 504 of the
     Rehabilitation Act.

124. Plaintiff engaged in protected conduct by reporting Dr. Chung's discriminatory treatment to
     MIT administrators.

125. Because of her protected activity MIT subjected Plaintiff to an adverse action by removing
     her from Dr. Chung's laboratory, depriving her of funding that was promised to her, and

instituting a baseless research misconduct investigation against her in violation of its rules and procedures.

126. Plaintiff has suffered damages as a result of Defendant's MIT's actions, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT VI
### Retaliation in Violation of the Americans with Disabilities Act
*(Against Defendants MIT and Chung)*

127. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

128. Defendant MIT is a place of public accommodation under Title III of the Americans with Disabilities Act.

129. Plaintiff engaged in protected conduct by reporting Dr. Chung's discriminatory treatment to MIT administrators.

130. Because of her protected activity Defendants subjected Plaintiff to an adverse action by removing her from Dr. Chung's laboratory, depriving her of funding that was promised to her, and instituting a baseless research misconduct investigation against her in violation of its rules and procedures.

131. Plaintiff has suffered damages as a result of Defendants' actions, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT VII
## **Breach of Contract**
### *(Against Defendant MIT)*

132. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

133. Plaintiff contracted with MIT University to provide her with access to its Ph.D. degree

    program. The contract between Plaintiff and Defendant MIT is comprised of MIT's

    handbooks, manuals, and other documents, including but not limited to its Policies &

    Procedures, the Institute Policy Guiding the Graduate Student Experience, the Common

    Principles of the Graduate Student Experience, Rules & Regulations of the Faculty, and the

    Supplement to MIT Procedures for Dealing with Research Misconduct.

134. Defendant MIT breached its contract with Plaintiff when Dr. Chung failed to adhere to

    numerous provisions of MIT's policies regarding his responsibilities as Plaintiff's

    supervisor. These included his responsibilities to provide a non-discriminatory and inclusive

    environment, to promptly inform Plaintiff of any matter that might affect her funding, and to

    provide Plaintiff opportunities for professional growth and development.

135. Defendant MIT further breached its contract with Plaintiff by failing to adhere to its Policies

    & Procedures in addressing her complaint of sexual and gender-based discrimination by

    failing to provide a prompt, fair, and impartial process; failing to provide Plaintiff with

    effective interim measures to ensure that she would not be deprived of her educational

    opportunities while MIT investigated her discrimination complaint; by taking 456 days (310

    business days) to investigate the complaint, when the policy provides for a 75-business day

    investigation.

136. Defendant MIT further breached its contract with Plaintiff, by and through its employees, by retaliating against her after she filed her complaint against Dr. Chung, in violation of its policies prohibiting retaliation.

137. Defendant MIT further breached its contract with Plaintiff by and through its employees when Drs. Chung and Wilson failed to promptly report any concerns about Plaintiff's research to the VPR and instead plotted to expel her from Dr. Chung's laboratory with no process by which to determine if there had been any research misconduct. Defendant further breached its contract with Plaintiff by failing to promptly initiate its research misconduct inquiry after a complaint was eventually made to the VPR and the VPR determined such an inquiry was warranted and failing to conduct that inquiry within 60 calendar days of its initiation.

138. As a direct and proximate cause of Defendant MIT's breaches of contract set forth above, Plaintiff was removed from Dr. Chung's laboratory and has been prevented from completing her Ph.D. research and earning her Ph.D. She has further been removed from MIT, deprived of her stipend and benefits, and been subjected to a years-delayed and baseless research misconduct inquiry.

139. Plaintiff has suffered damages as a result of Defendant's MIT's breaches, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT VIII
## Breach of the Covenant of Good Faith and Fair Dealing
*(Against Defendant MIT)*

140. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

141. Plaintiff's contractual relationship with Defendant MIT contains within it an implied covenant of good faith and fair dealing.

142. Defendant MIT breached that covenant by failing to execute its obligations under its policies with good faith.

143. Defendant MIT permitted Dr. Chung to remove Plaintiff from his laboratory for discriminatory reasons without following any process whatsoever.

144. Defendant MIT engaged in a biased and unfair investigation of Plaintiff's discrimination complaints that was not aimed at, or calculated to, determine whether Dr. Chung's behavior violated MIT's policies.

145. MIT, by and through its employees, worked to deprive Plaintiff of the protections of the research misconduct policy, and to discipline her for alleged research misconduct without any process to determine if those allegations were true.

146. MIT unreasonably delayed the initiation of its research misconduct inquiry, allowing its employees to spread false allegations about Plaintiff to others in the community, and preventing Plaintiff from knowing about or responding to the allegation of research misconduct.

147. Plaintiff has suffered damages as a result of Defendant's MIT's breach of the covenant of good faith and fair dealing, including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT IX
## Defamation
*(Against Defendant Chung)*

148. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

149. Defendant Chung made statements to MIT administrators and faculty about Plaintiff, namely, that she had falsified research.

150. The statement that Plaintiff falsified research is false.

151. Dr. Chung was negligent in making that statement because Plaintiff had offered to provide him with the documentation and data showing that she did not falsify research, and he refused to accept that information.

152. As a result of Dr. Chung's defamatory statements, Plaintiff was deprived of access to tools she needed to complete her Ph.D. research, and thus could not obtain her Ph.D.

153. As a result of Dr. Chung's defamatory statements, Plaintiff has suffered damages including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

## COUNT X
## Tortious Interference with Advantageous Relationships
*(Against Defendant Chung)*

154. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

155. Plaintiff had a contractual relationship with MIT under which she was to be given the opportunity and tools to pursue her Ph.D. research and obtain her Ph.D.

156. Plaintiff had a relationship with Dr. Tsai of the Picower Institute, wherein Dr. Tsai had granted Plaintiff access to a microscope Plaintiff needed to complete her Ph.D. research.

157. When Dr. Chung learned that Dr. Tsai had granted Plaintiff access to the microscope, Dr. Chung reached out to Dr. Tsai and falsely told her that Plaintiff had engaged in research

misconduct. Dr. Chung told Dr. Tsai he was concerned about Plaintiff having access to the microscope.

158. Dr. Tsai then revoked Plaintiff's access to the microscope, preventing her from conducting the lab research she needed in order to complete her Ph.D. and pursue her career.

159. As a result of Dr. Chung's tortious interference, Plaintiff has suffered damages including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, lost future wages, and reputational harm.

**COUNT XI**
**Promissory Estoppel**
*(Against Defendant Chung)*

160. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

161. Defendant Chung promised Plaintiff that if she left his laboratory and went to work in another laboratory, he would serve as her co-advisor, provide her financial support, and provide her equipment and resources she needed to continue her research.

162. Based on Dr. Chung's promises, Plaintiff found a new laboratory in which to complete her project and attempted to continue her research in that laboratory. Her arrangements with that laboratory were premised on the understanding that she would have the funding and other resources Dr. Chung had promised.

163. Contrary to his promise, six months after removing Plaintiff from his laboratory, Dr. Chung refused to serve as her co-advisor, refused to provide the financial support he promised, and refused to provide Plaintiff with the equipment and resources she required to conduct her research.

164. Because of Dr. Chung's refusal to uphold his promise, Plaintiff spent years unsuccessfully attempting to complete her project without the necessary funding or equipment to do so. She has never been able to complete her Ph.D.

165. As a result of Dr. Chung's actions, Plaintiff has suffered damages including loss of the opportunity to pursue her Ph.D., lost job opportunities, lost income, and lost future wages.

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Award Plaintiff compensatory and punitive damages in an amount to be determined at trial;

2. Award Plaintiff the reasonable costs and expenses of this action and reasonable legal fees as provided by applicable law;

3. Award Plaintiff all other damages as permitted by applicable law;

4. Grant all such other relief, including injunctive relief, as this Court deems equitable and just.

### PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,
MARGARET MCCUE
By her attorneys,

/s/ Ruth O'Meara-Costello
RUTH O'MEARA-COSTELLO (Mass. Bar. No. 667566)
NAOMI SHATZ (Mass. Bar. No. 677637)
ZALKIND DUNCAN & BERNSTEIN LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020 (telephone)
(617) 742-3269 (fax)
rcostello@zalkindlaw.com
nshatz@zalkindlaw.com

Dated: September 28, 2020

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on the above date.

/s/ Ruth O'Meara-Costello
Ruth O'Meara-Costello